97 F.3d 1161
 27 Envtl. L. Rep. 20,322, 96 Cal. Daily Op.
Serv. 4269,
96 Daily Journal D.A.R. 6889
 NORTHWEST FOREST RESOURCE COUNCIL, an Oregon corporation;
Scott Timber Co., Plaintiffs-Appellees,
v.
PILCHUCK AUDUBON SOCIETY; Oregon Natural Resources Center;
Portland Audubon Society; Black Hills Audubon Society;
Western Ancient Forest Campaign; Headwaters; Coast Range
Association; Friends of Elk River; Washington
Environmental Council; Seattle Audubon Society,
Intervenors-Appellants,
v.
Dan GLICKMAN, et al., Defendants,
v.
WESTERN TIMBER COMPANY; Vaagen Brothers Lumber, Inc.,
Plaintiffs-Intervenors-Appellees.
NORTHWEST FOREST RESOURCE COUNCIL, an Oregon corporation;
Scott Timber Co., Plaintiffs-Appellees,
v.
Dan GLICKMAN, in his official capacity as Secretary of
Agriculture, et al., Defendants,
and
Oregon Natural Resources Center; Pilchuck Audubon Society;
Sierra Club, Inc.; Western Ancient Forest Campaign;
Portland Audubon Society; Black Hills Audubon Society;
Headwaters, Intervenors-Appellants,
and
Oregon Natural Resources Center, et al.,
Defendants-Intervenors-Appellants.
NORTHWEST FOREST RESOURCE COUNCIL, an Oregon corporation;
Scott Timber Co., Plaintiffs-Appellees,
v.
Dan GLICKMAN, in his capacity as Secretary of Agriculture,
and Bruce Babbitt, in his capacity as Secretary of
Interior; Defendants-Appellants,
and
Oregon Natural Resources Center; Pilchuck Audubon Society;
Portland Audubon Society; Black Hills Audubon Society;
Western Ancient Forest Campaign; Headwaters; Coast Range
Association; Friends of Elk River; Washington
Environmental Council; Seattle Audubon Society; Sierra
Club, Inc., Intervenors.
NORTHWEST FOREST RESOURCE COUNCIL, an Oregon corporation;
Scott Timber Co., Plaintiffs-Appellees,
v.
DAN GLICKMAN, in his capacity as Secretary of Agriculture,
and Bruce Babbitt, in his capacity as Secretary of Interior;
and
Oregon Natural Resources Center; Pilchuck Audubon Society;
Black Hills Audubon Society; Western Ancient Forest
Campaign; Headwaters; Coast Range Association; Friends of
Elk River; Washington Environmental Council; Seattle
Audubon Society; Sierra Club, Inc., Intervenors,
v.
Dan Glickman, et al.; Bruce Babbitt, Defendants-Appellants.
 Nos. 96-35106, 96-35107, 96-35123 and 96-35132.
 United States Court of Appeals,
Ninth Circuit.
 Argued and Submitted May 7, 1996.
Decided June 14, 1996.
Rehearing Denied July 22, 1996.
 
 Patti A. Goldman and Kristen L. Boyles, Sierra Club Legal Defense Fund, Seattle, Washington, for Oregon Natural Resources Council and Pilchuck Audubon Society, et al.
 Albert M. Ferlo, Jr., United States Department of Justice, Washington, DC, for the Federal Government.
 Mark C. Rutzick, Portland, Oregon, for Northwest Forest Resource Council.
 Scott W. Horngren, Haglund & Kirtley, Portland, Oregon, for Scott Timber Co., Vaagen Bros. Lumber, Inc.
 Appeals from the United States District Court for the District of Oregon, Michael R. Hogan, District Judge, Presiding. D.C. No. CV-95-06244-MRH.
 Before GOODWIN and SCHROEDER, Circuit Judges, and ARMSTRONG, District Judge.**
 GOODWIN, Circuit Judge:
 
 
 1
 This is a consolidated appeal of two separate injunctions releasing government timber for sale pursuant to § 2001(k)(1) and (2) of the 1995 Supplemental Appropriations for Disaster Assistance and Rescissions Act. Pub.L. No. 104-19, § 2001(k), 109 Stat. 194, 240-47. The first order, dated January 10, 1996, rejected a challenge to the constitutionality of the statute and found that certain timber sales were covered by § 2001(k)(1) and ordered their immediate release.
 
 
 2
 The second order, issued January 19, 1996, was stayed by this court pending appeal. That order rejected the Forest Service and Bureau of Land Management's implementation of § 2001(k)(2), using a scientific protocol, as not in compliance with the statute's language which exempts certain timber sales where endangered and threatened birds are "known to be nesting."
 
 
 3
 We affirm the district court's determination that the statute is constitutional, and the determination that the statute applies to timber sales previously enjoined or cancelled before the passage of § 2001(k)(1).
 
 
 4
 We reverse the district court's order holding that timber sales offered in violation of § 318 fall within the scope of § 2001(k)(1). We reverse the order holding, with respect to certain specific sales, that the statute requires the "previously offered sales" to be offered to all original bidders. We also reverse the district court's determination that the agencies' use of the PSG protocol for determining when marbled murrelets are "known to be nesting" is inconsistent with the plain language of the statute.
 
 I. Factual and Procedural History
 
 5
 On July 27, 1995, the President signed the 1995 Rescissions Act. Section 2001 of the Act sets out an emergency salvage timber program which directs the Secretaries of Agriculture and Interior (Secretaries) to expedite the award of timber harvesting contracts on federal lands in three ways. Section 2001(b) establishes expedited procedures for the release of "salvage" timber sales on a nationwide basis. Section 2001(d) directs the Secretaries to award timber sales on Federal lands described in a specific Record of Decision under The Northwest Forest Plan. Section 2001(k) requires the release and harvesting of certain timber sales which Congress had previously authorized in the Northwest Timber Compromise of 1989, also known as § 318. The background and constitutionality of § 318 are discussed in Robertson v. Seattle Audubon Society, 503 U.S. 429, 112 S.Ct. 1407, 118 L.Ed.2d 73 (1992).
 
 
 6
 Section 2001(k) is the only section of the Rescissions Act at issue in this appeal:(1) AWARD AND RELEASE REQUIRED
 
 
 7
 Notwithstanding any other provision of law, within 45 days after the date of the enactment of this Act, the Secretary concerned shall act to award, release, and permit to be completed in fiscal years 1995 and 1996, with no change in originally advertised terms, volumes, and bid prices, all timber sales contracts offered before that date [July 27, 1995] in any unit of the National Forest System or district of the Bureau of Land Management subject to section 318 of Public Law 101-121. The return of the bid bond of the high bidder shall not alter the responsibility of the Secretary to comply with this paragraph.
 
 
 8
 (2) THREATENED OR ENDANGERED BIRD SPECIES
 
 
 9
 No sale unit shall be released or completed under this subsection if any threatened or endangered bird species is known to be nesting within the acreage that is the subject of the sale unit.
 
 
 10
 (3) ALTERNATIVE OFFER IN CASE OF DELAY
 
 
 11
 If for any reason a sale cannot be released and completed under the terms of this subsection within 45 days after the date of the enactment of this Act, the Secretary concerned shall provide the purchaser an equal volume of timber, of like kind and value, which shall be subject to the terms of the original contract and shall not count against current allowable sale quantities.
 
 
 12
 Section 2001(k), Pub.L. No. 104-19, 109 Stat. 194, 240-47.
 
 
 13
 In an earlier case under § 2001(k)(1) this court held that the section covers timber sales offered by either the Forest Service (FS) or Bureau of Land Management (BLM) in any national forest in Washington and Oregon and any of the six BLM districts in western Oregon between the effective date of § 318 and the effective date of § 2001(k). NFRC v. Glickman, 82 F.3d 825 (9th Cir.1996).
 
 
 14
 In the cases presently before this court the district court determined that § 2001(k)(1) applied to sales cancelled prior to July 27, 1995 as a result of legal challenges and to sales cancelled because of the high bidder's inability or unwillingness to proceed with the sale. The Secretaries of Interior and Agriculture, timber industry representatives and several environmental organizations (Pilchuck) appeal.
 
 II. Section 2001(k)(1)
 
 15
 Three separate issues concerning § 2001(k)(1) were before the district court. Appellants argued: 1) the statute is unconstitutional, 2) the statute does not apply to timber sales previously enjoined or cancelled before the passage of 2001(k)(1), and 3) the statute requires only that the "previously offered sales" be offered to the original high bidder.
 
 A. Constitutionality of the Statute
 
 16
 Pilchuck's argument that § 2001(k)(1) violates separation of powers by permitting Congress to resurrect sales that had been enjoined by federal courts was answered by the Supreme Court in Robertson v. Seattle Audubon Soc., 503 U.S. 429, 112 S.Ct. 1407, 118 L.Ed.2d 73 (1992). Separation of powers is violated where 1) Congress has impermissibly directed certain findings in pending litigation, and 2) did not change any underlying law. Id. The district court applied Robertson v. Seattle Audubon and correctly determined that the § 2001(k)(1) is constitutional.
 
 B. Previously enjoined or cancelled sales
 
 17
 Because § 2001(k) is constitutional, we must review whether all sales "offered" since the effective date of § 318 are included under the mandate of § 2001(k)(1), as held by the district court. The use of the word "offered" in § 2001(k)(1) means any timber sale where the bids are opened at auction. This language does not exclude cancelled or enjoined sales from § 2001(k)(1) because the bids would have been opened before the cancellation or injunction occurred. The Secretaries concede that opening the bids constitutes an "offer" of a timber sale. This is a reasonable interpretation of "offer" in the statute. Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984).
 
 
 18
 Taking the above definition of "offered," the plain language of "all timber sale contracts offered" mandates the conclusion of the district court. To exclude enjoined, cancelled or withdrawn sales would permit an implied exception which does not exist.
 
 
 19
 This does not require the release of timber sales under § 2001(k)(1) which were never validly offered. The Secretaries argue that four sales enjoined by the Western District of Washington for violations of § 318 (Cowboy, Nita, South Nita and Garden) are "void ab initio" because there never was a valid offer under § 318. Nothing in § 2001(k)(1) makes a valid sale out of sale which was not valid under its authorizing statute. If, for example, agency employees made a mistake and offered timber that was not authorized by statute for harvest, § 2001(k)(1) does not validate that mistake.
 
 
 20
 The record before us indicates the four sales at issue here were enjoined for violations of their authorizing statute, and were therefore never validly offered within the meaning of § 2001(k)(1). These four sales are void ab initio, and are not revived by § 2001(k)(1).
 
 
 21
 C. Award of Timber Sales to other than the High Bidder
 
 
 22
 On September 13, 1995, the district court issued an order requiring the release of all sales offered in the region defined by § 318. The Secretaries proceeded to offer the sales to previously identified high bidders. In cases where the high bidders were unwilling, unable or unqualified to take advantage of the renewed offer, the Secretaries determined that nothing in § 2001(k)(1) required them to seek out unsuccessful bidders and release the sales to these unsuccessful bidders.
 
 
 23
 Timber industry representatives have challenged this interpretation of § 2001(k)(1) in these combined cases. The district court held that the statute requires the Secretaries to release failed sales to other bidders where no high bidder is available. The district court found that any regulations that obstruct the statutory objectives of § 2001(k)(1) are preempted, including the regulations which permit the Secretaries to reject unqualified bidders. The district court noted that "[r]egulations which give the agency discretion not to try and award an offered sale to other bidders would frustrate section 2001(k)(1)'s objectives."
 
 
 24
 The Forest Service and BLM each have extensive statutes and regulations which govern timber sales. The Forest Service is governed by the National Forest Management Act of 1976 (NFMA), 16 U.S.C. 472a et seq. and regulations found in 36 C.F.R. part 223. BLM is governed by 43 U.S.C. 1181a, 1701 et seq. and 43 C.F.R. part 5000. Under both agencies' regulations, the agency retains the discretion to award or refuse to award a sale where the high bidder is ineligible.
 
 
 25
 In order to find that § 2001(k)(1) preempts the regulatory authority of the Secretaries, we must find that the two acts are in "irreconcilable conflict, [so that] the later act to the extent of the conflict constitutes an implied repeal of the earlier one." Radzanower v. Touche Ross & Co., 426 U.S. 148, 154, 96 S.Ct. 1989, 1993, 48 L.Ed.2d 540 (1970). Such an implied repeal must be based on "clear and manifest" intent. Id. Implied repeals are not favored by the courts "and will only be found when the new statute is clearly repugnant, in words or purpose, to the old statute ..." Grindstone Butte Project v. Kleppe, 638 F.2d 100, 102 (9th Cir.1981), cert. denied, 454 U.S. 965, 102 S.Ct. 505, 70 L.Ed.2d 380 (1981) (internal quote omitted). An implied repeal is especially disfavored when the claimed repeal relies on an appropriations act. TVA v. Hill, 437 U.S. 153, 190, 98 S.Ct. 2279, 2299-2300, 57 L.Ed.2d 117 (1978).
 
 
 26
 The Secretaries argue there is no irreconcilable conflict between § 2001(k)(1) and the contract authorities established under the agencies' organic acts which require the FS and BLM to take no further action on timber sales beyond an award to the successful high bidder. The district court simply concluded that the "notwithstanding" language preempts all regulations that "obstruct the subsequent statute's objectives." That conclusion goes too far.
 
 
 27
 The district court did not determine whether the repeal of the contract authority of the Secretaries was to the "minimum extent necessary" to serve a "clear and manifest demonstration of legislative intent." The "notwithstanding" clause is not necessarily preemptive. E.P. Paup Co. v. Director, 999 F.2d 1341, 1348 (9th Cir.1993) (finding that "notwithstanding any other provision of law" is not necessarily preemptive where legislative history reveals no intent to preempt).
 
 
 28
 Section 2001(k)(1) requires the agencies to "act to award, release, and permit to be completed" all timber sales offered prior to the Act's enactment. The statute is silent on the question of to whom the award must be made. Nothing in the language of § 2001(k)(1) implies the preemption of the existing regulations governing the award of contracts, or the duty of the Secretaries to protect government property by requiring successful bidders to meet standard qualifications.
 
 
 29
 An implied repeal of the underlying statutory and regulatory provisions governing the timber sale contracting process may be found only if no other construction is possible. Here, § 2001(k)(1) itself incorporates other laws by referring to the "award" and "release" and "original contract terms" of timber sale contracts. See In re Glacier Bay, 944 F.2d at 582 (finding the phrase "notwithstanding any other provision of law" is not dispositive where other laws are included by reference). The agencies have regulations which tell them what these words mean and how to form such contracts.
 
 
 30
 Section 2001(k)(1) is not clearly repugnant, in words or purpose, to the contract regulations established under the agencies' organic acts. Indeed, § 2001(k)(1) incorporates the original contract terms and requires the Secretaries to look to their regulations in making the awards. As there is no irreconcilable conflict § 2001(k)(1) does not preempt the Secretaries' regulations governing the award of timber sales, regulations which grant the Secretaries discretion in deciding whether to make awards to entities other than the high bidders.
 
 
 31
 III. Section 2001(k)(2) "Known to be Nesting"
 
 
 32
 The California, Washington and Oregon populations of marbled murrelets were added to the federal list of threatened species on Oct. 1, 1992. Following this listing, the Forest Service initiated consultation under the ESA with the Fish and Wildlife Service (FWS) regarding the effect of the remaining § 318 sales on marbled murrelets. Of the 7.3 billion board feet of timber sold by the FS under § 318, approximately 250 million board feet were affected by the murrelet consultation.
 
 
 33
 The Forest Service concluded further logging of 77 of the sales would jeopardize continued existence of murrelets. The FS premised this determination on application of the "PSG Protocol." The PSG Protocol is designed to detect presence or probable absence of murrelets in a forest stand. Federal agencies, research institutions and private industry developed this protocol because the behavior of marbled murrelets makes it difficult for human observers to locate actual murrelet nests.[1] This protocol is "the generally accepted scientific methodology employed to determine whether marbled murrelets are located in, or making use of, a particular inland forested site for nesting purposes." Marbled Murrelet v. Pacific Lumber Co., 880 F.Supp. 1343, 1350-51 n. 15 (N.D.Cal.1995). In developing the protocol, the biologists analyzed various types of murrelet behavior to distinguish nesting and breeding activities from mere presence in a particular stand of trees. Nesting and breeding activities are classified as "occupancy" under the protocol.
 
 
 34
 Section 2001(k), as originally passed by the House, mandated the release of all remaining § 318 sales without exception. Section 2001(k)(2) was added by the Senate. The PSG protocol was never mentioned, and Congress took no scientific testimony. Congress gave the agencies no additional guidance beyond the phrase "known to be nesting within the acreage that is the subject of the sale unit" to determine which timber sales were to be exempted from § 2001(k)(1) and compensated for under § 2001(k)(3).
 
 
 35
 If a statute is ambiguous, or unclear, the legislative history can be examined to see if it expresses the intent of Congress. The legislative history of § 2001(k) is cited extensively by the district court and the parties. There are floor statements on the bill, committee reports, and a conference report. There are also post-enactment statements and statements made during debate on the failed "Murray Amendment."[2] This legislative history does not answer the question of what type of evidence the agency is to use in making a "known to be nesting" determination.
 
 
 36
 Relying on a footnote from Religious Technology Center v. Wollersheim, 796 F.2d 1076, 1086 n. 10 (9th Cir.1986), the district court incorrectly concluded that a post-enactment letter from six members of Congress cannot be ignored. The letter stated that § 2001(k)(2) is much more narrow than the PSG definition of "occupied." In Religious Technology the history at issue was a floor statement made in the Senate on similar legislation the following term. A letter from a handful of Senators and Representatives after enactment cannot substitute for legislative history. "Material not available to the lawmakers is not considered, in the normal course, to be legislative history." Gustafson v. Alloyd Co., 513 U.S. 561, ----, 115 S.Ct. 1061, 1071, 131 L.Ed.2d 1 (1995).
 
 
 37
 The Secretaries attempted to apply the "known to be nesting" standard using the PSG Protocol and the survey data collected under the protocol. The Secretaries believe that the protocol is consistent with the requirements of § 2001(k)(2) and the only prudent means to determine the presence of nesting murrelets. Scott Timber Company and Northwest Forest Resource Council challenge the Secretaries interpretation of § 2001(k)(2). They argue for an interpretation that would allow a determination of "nesting" only if there is physical evidence such as eggshell fragments, fecal rings or dead chicks present on or below a tree.
 
 
 38
 The district court rejected both interpretations of § 2001(k)(2) and formulated its own. The court found that the PSG protocol was "inconsistent" with the plain language of § 2001(k)(2) to the extent that it "permits nesting determination to be based on circling, calling, or other evidence that cannot be located within the acreage that is the subject of the sale unit."
 
 
 39
 While rejecting the Secretaries' interpretation of the PSG protocol, the district court also found that the statute "does not specify the evidence necessary to sustain a 'known to be nesting determination.' " The district court was correct in its determination that the "known to be nesting" language is unclear. Known to whom? is a reasonable question. Congress gave no answer.
 
 
 40
 The district court was also correct in observing that the legislative history fails to address what "known to be nesting" means. The district court erred, however, in failing to defer, in the face of uncertainty, to the Secretaries' interpretation, and in substituting its own judgment on a question requiring highly specialized or scientific expertise.[3]
 
 
 41
 The plain language of § 2001(k)(2) does not require a "nest" to be found before this section would apply to a timber sale. Rather the statute uses the phrase "known to be nesting" which encompasses a range of activity associated with nesting. It is exactly this type of legislation, aimed at administrative agencies of government, for which Chevron requires deference to agency biologists' expertise. Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837, 843, 104 S.Ct. 2778, 2782, 81 L.Ed.2d 694 (1984) (when a statute is unclear or ambiguous, the district court is required to defer to the agencies' interpretation of the statute, so long as it is "based on a permissible construction of the statute"). The power of the Secretaries to administer the Congressionally created program "necessarily requires the formulation of policy and the making of rules to fill any gap left, implicitly or explicitly, by Congress." Id. at 843, 104 S.Ct. at 2782 citing Morton v. Ruiz, 415 U.S. 199, 231, 94 S.Ct. 1055, 1072-73, 39 L.Ed.2d 270 (1974).
 
 
 42
 Under the PSG Protocol, the Secretaries consider "occupied" behavior to be synonymous with actual nesting due in part to the particular behavior of this species of bird. According to agency biologists, a determination that a particular stand of trees is a nesting stand is based on a statistical analysis of the number and character of murrelet detections in a particular tree stand. The types of evidence include: (1) detection of an active nest or recent nest by a fecal ring or eggshell fragments; (2) the more readily observed activity of birds flying in, out or through the canopy; or (3) birds circling directly over or under the canopy. Detection of a murrelet flying overhead across a tree stand is not considered to be a behavior indicating nesting or breeding in that stand. Further investigation to locate a nest is not required under the protocol or Forest Service policy, and has not been pursued in the timber sales at issue in this case.
 
 
 43
 For the past five years, the FS, the FWS and independent scientists have accepted the "occupancy" determination under the PSG protocol as the criterion for establishing nesting use of forested stands. Marbled Murrelet v. Pacific Lumber Co., 880 F.Supp. at 1350-51 n. 15. Evidence in the record indicates that the determinations under the protocol are 95-100% accurate in predicting nesting behavior. According to the agencies' experts, there is no other reliable scientifically accepted and tested method for identifying nest stands.
 
 
 44
 After passage of § 2001(k)(2), the Secretaries issued direction regarding implementation of the section. Survey data collected pursuant to the protocol was considered the best available scientific information upon which to base a determination of whether murrelets were known to nesting in a sale unit. The agencies then issued determinations under § 2001(k)(2).
 
 
 45
 The question we must answer is not whether Congress intended to adopt the PSG protocol, but whether, in the absence of clear statutory language, the Secretaries' use of an "occupancy" determination under the PSG protocol is a reasonable interpretation of the statute's requirement that threatened or endangered birds are "known to be nesting" within the boundaries of a sale unit. Agency experts have concluded that, with respect to marbled murrelets, "nesting" is "completely synonymous" with a finding that a sale unit is occupied.
 
 
 46
 The PSG protocol was not adopted by the agencies as a formal regulation pursuant to the Administrative Procedure Act. However, the agencies had been applying the PSG protocol at least from the time marbled murrelets were listed in 1992. Their biologists had participated in the development of the protocol, and the record supports the conclusion that the agencies had endorsed and applied the protocol to nesting determinations.
 
 
 47
 The Secretaries' interpretation may be rejected only if it is contrary to clear congressional intent and frustrates the purpose of § 2001(k)(2). If the statute is ambiguous, "the question for the court is whether the agency's answer is based on a permissible construction of the statute." Chevron, 467 U.S. at 843, 104 S.Ct. at 2782.
 
 
 48
 The court must defer to the Secretaries' interpretation if it "is a permissible and reasonable one even if it is not the best one or the one this court might choose in the absence of a prior administrative interpretation." Almero v. I.N.S., 18 F.3d 757 (9th Cir.1994) (Judge Rymer dissenting) citing U.S. v. 313.34 Acres of Land, 923 F.2d 698, 701 (9th Cir.1991). The location and determination of what birds are doing in which location is the type of program that has to be designed and implemented by agency experts unless there is clear Congressional intent to the contrary.
 
 
 49
 Congress gave the agencies 45 days to award the timber sales. It seems implausible that Congress intended the Secretaries to create and implement a new system for determining whether threatened and endangered birds were "known to be nesting" within a given sale unit within that time period. Rather, the Senate added § 2001(k)(3) which allows for the provision of alternative timber where a specific sale is prohibited by § 2001(k)(2). Given the language of the statute and time-frame for implementation, the Secretaries' resort to a natural-history protocol which predated the current controversy in making nesting determinations under § 2001(k)(2) is a reasonable interpretation of the statute.
 
 IV. Conclusion
 
 50
 The district court's determination that the statute is constitutional is AFFIRMED. The district court's determination that the statute applies to timber sales previously enjoined or cancelled before the passage of 2001(k)(1) is AFFIRMED. The district court's determination that timber sales offered in violation of their authorizing statutes are within the scope of § 2001(k)(1) is REVERSED. The district court's determination that the statute requires the "previously offered sales" be offered to all previous bidders is REVERSED. The district court's determination that the Secretaries' use of the PSG protocol for determining when marbled murrelets are "known to be nesting" violates the statute is REVERSED.
 
 
 51
 NO PARTY TO RECOVER COSTS OR ATTORNEY FEES ON APPEAL.
 
 
 
 **
 Honorable Saundra Brown Armstrong, United States District Judge for the Northern District of California, sitting by designation
 
 
 [1]
 The authors of the protocol were appointed by the Pacific Seabird Group (PSG), a professional scientific organization which takes a lead role in coordinating and promoting research on marbled murrelets
 
 
 [2]
 The so-called Murray Amendment was offered by Senator Murray of Washington on March 30, 1995. 141 Congressional Record S4869
 
 
 [3]
 The district court acknowledged its obligation under the Chevron doctrine, but then gave no deference to the protocol, relying instead on the post-enactment letter and Bowen v. Georgetown Univ. Hosp., 488 U.S. 204, 212, 109 S.Ct. 468, 473-74, 102 L.Ed.2d 493 (1988)
 The district court's reliance on Bowen is misplaced. In Bowen, the court declined to give any deference to a statutory interpretation espoused by the agency's counsel that the agency had not implemented. The Supreme Court said that despite this novel interpretation of deference, the court has "never applied the principle of ... [Chevron ] to agency litigating positions that are wholly unsupported by regulations, rulings, or administrative practice." Bowen, 488 U.S. at 212, 109 S.Ct. at 473-74. The PSG protocol is more than an agency litigating position.