**SHOSHONE–BANNOCK TRIBES OF THE FORT HALL RESERVATION,** Plaintiff,

v.

**Donna E. SHALALA, Secretary of the United States Health and Human Services; Michael H. Turjillo, Director of the Indian Health Service, United States Department of Health and Human Services; Douglas Black, Di-**

rector of Office of Tribal Activities, Indian Health Service; James R. Floyd, Portland Area Director, Indian Health Service, United States Department of Health and Human Services, Defendants.

No. CV–96–459–ST.

United States District Court, D. Oregon.

July 22, 1999.

Lori Irish Bauman, Ater Wynne Hewitt Dodson & Skerritt, Portland, OR, Lloyd Benton Miller, James E. Glaze, Sonosky Chambers Sachse Miller & Munson PC, Anchorage, AK, for Plaintiff.

Kristine Olson, U.S. Attorney's Office, Portland, OR, Daniel Bensing, U.S. Dept. of Justice, Civil Div., Washington, DC, Sheila M. Lieber, U.S. Dept. of Justice, Civil Div., Federal Program Branch, Washington, DC, for Defendants.

## OPINION

STEWART, United States Magistrate Judge.

On January 13, 1999, this court denied in part and granted in part defendants' Motion for Indicative Ruling and for Reconsideration (docket # 131), stating that it would entertain, without indicating whether it would grant or deny, defendants' motion under FRCP 60(b) provided that the Ninth Circuit Court of Appeals remanded this case for that purpose. On February 11, 1999, the Ninth Circuit remanded this case "for the limited purpose of a determination of the appellants' motion under FRCP 60(b)" (docket # 35). However, this court did not require defendants to file a new motion under FRCP 60(b) and instead construed defendants' Motion for Indicative Ruling and for Reconsideration as including an underlying motion under FRCP 60(b). For the reasons set forth below, defendants' motion under FRCP 60(b) is denied.

### BACKGROUND

Defendants' motion deals solely with this court's prior rulings concerning plaintiff's claim for contract support cost ("CSC") for Fiscal Year ("FY") 1996 and FY 1997.

### I. *The Parties' Positions*

In FY 1996, Congress appropriated $1.7 billion to the Indian Health Service ("IHS"). Of that sum, Congress "recommended" that $7.5 million "shall remain available until expended for the Indian Self–Determination Fund" ("ISD Fund") which pays CSC for new self-determination contracts. *Shoshone–Bannock Tribes v. Shalala*, 988 F.Supp. 1306, 1330 (D.Or. 1997) (*"Shoshone–Bannock I"*), *on reconsideration*, 999 F.Supp. 1395 (D.Or.1998) (*"Shoshone–Bannock II"*), citing HR 104–173.[1] The parties agreed that the Congressional recommendation of $7.5 million for the ISD Fund was not an "earmark" or cap on the amount the Secretary can pay

---

1. The FY 1997 Appropriations Act contains a nearly identical limitation. *Shoshone–Ban-* *nock I*, 988 F.Supp. at 1330, n. 15.

for CSC, but was intended to segregate such funds for "no year" status which has no fiscal year limitation or expiration date. *Id.*

Because $7.5 million was not sufficient to pay the CSC claims for all tribes, IHS adopted a policy of allocating the ISD Fund for new CSC contracts through the use of a queue which paid CSC requests on a first-come, first-served basis. This policy could potentially delay full CSC funding to plaintiff for many years or not at all. Defendants justified this policy by contending that, while the Secretary of Health and Human Services ("Secretary") had the discretion to reach into her $1.7 billion lump sum appropriation to pay any new CSC claims in excess of the $ 7.5 million ISD Fund, she also had "the discretion not to reduce funding for other programs or services to other tribes in order to pay" plaintiff's CSC claim. *Id.*

Regardless of the amount of money in the ISD Fund, plaintiff alleged that it had a statutory entitlement to full CSC funding "upon the approval of a self-determination contract," 25 USC § 450-j-1(g), and that IHS's use of a queue to pay CSC only from the ISD Fund violated plaintiff's rights under the Indian Self-Determination and Education Assistance Act, as amended ("ISDEA"), 25 USC §§ 450a-450n.

## II. *The Court's Ruling*

After reviewing the parties' respective positions, the text of the ISDEA and the limited case law interpreting the ISDEA, the court rejected the Secretary's argument. *Shoshone–Bannock I,* 988 F.Supp. at 1330. Focusing on the Secretary's burden of clearly demonstrating that "sufficient appropriated funds are available to pay CSC to the Shoshone–Bannock Tribes," *id* at 1333, the court concluded that in the absence of a clear restriction by Congress in its appropriations, the Secretary must use her lump sum appropriation to pay all of plaintiff's CSC claims:

**2.** *Ramah Navajo Chapter v. Lujan,* 112 F.3d 1455 (10th Cir.1997) (holding the Bureau of

Here no statutory minimum or maximum was placed on CSC funding. The Secretary simply decided that, pursuant to the recommendation of the Committee Report, $7.5 million was an appropriate sum to be allocated to new CSC for FY 1996.

\*     \*     \*     \*     \*     \*

However, the tentative budget allotment between existing and new CSC relied upon by the Secretary was not carried into the language of the 1996 Appropriations Act. *Thus no statute expressly restricts the Secretary's ability to shift funds within its general appropriations to pay CSC.*

*Id.* at 1331–32 (emphasis added).

Because defendants "offered no evidence" that the entire lump sum appropriation was inadequate to pay plaintiff's claim for CSC, on reconsideration the court granted plaintiff's motion for summary judgment. *Shoshone–Bannock II,* 999 F.Supp. at 1397.

The parties subsequently reached agreement as to the precise amount of plaintiff's FY 1996 and FY 1997 CSC claims. Defendants paid that amount (along with the amount of plaintiff's FY 1998 CSC claim, which is not at issue here), into the Registry of the Court, where it remains.

Defendants have advised the court that the FY 1996 and FY 1997 CSC amounts were not paid from $7.5 million ISD Fund in each of those years, as such amounts had been fully expended to pay new CSC claims of tribes that were ahead of plaintiff in the queue. Instead, the Secretary paid the CSC amounts from unrestricted FY 1996 and FY 1997 appropriations.

## III. *1998 Appropriations Act*

On October 21, 1998, after this court, other federal courts, and boards of contract appeals had allowed tribes' claims for CSC to be paid from the agencies' total lump sum appropriation,[2] Congress passed

Indian Affairs liable under the ISDEA for indirect costs for other agencies' programs);

the Omnibus Consolidated and Emergency Supplemental Appropriations Act 1999, Pub L No 105–277, 112 Stat 2681 ("OCEA"), which states in Section 314 as follows (emphasis added):

> Notwithstanding any other provision of law, *amounts appropriated to or earmarked in committee reports* for the Bureau of Indian Affairs and *the Indian Health Service* by Public Laws 103–138, 103–332, 104–134, 104–208 and 105–83 *for payments to tribes and tribal organizations for contract support costs* associated with self-determination or self-governance contracts, grants, compacts, or annual funding agreements with the Bureau of Indian Affairs or the Indian Health Service as funded by such Acts, *are the total amount available for fiscal years 1994 through 1998 for such purposes,* except that for the Bureau of Indian Affairs, tribes and tribal organizations may use their tribal priority allocations for unmet indirect costs of ongoing contracts, grants, self-governance compacts or annual funding agreements.

The five public laws cited in Section 314 are the final IHS Appropriations Acts for FY 1994 through FY 1998. Simultaneously, Congress also acted to curtail new CSC claims by placing a moratorium on new or expanded self-determination contracts or compacts under the ISDEA. *See* Pub L No 105–277, Section 328 ("none of the funds in this Act may be used to enter into any new or expanded self-determination contract or grant or self-governance compact pursuant to the Indian Self–Determination Act of 1975").

Defendants contend that Section 314, read in conjunction with Section 328, expressly rejected the statutory interpretation of the ISDEA by this court and others and prohibits the FY 1996 and FY 1997 CSC relief ordered in this case. They interpret Section 314 as converting Congress' prior "recommendation" into an "earmark" or cap of $7.5 million for the ISD Fund which prohibits the Secretary from paying any CSC from her lump sum appropriation.

Consequently, defendants ask the court to reconsider its order as to plaintiff's claim for FY 1996 and FY 1997 CSC.

### LEGAL STANDARD

FRCP 60(b) provides that the court may relieve a party from a final judgment, order, or proceeding.[3] Motions brought under this rule require the court to balance the interest in finality of judgments (ones which should not lightly be disturbed), and the desire to achieve justice. *See Rodgers v. Watt,* 722 F.2d 456, 459 (9th Cir.1983) (FRCP 60(b) should be construed, along with the other Federal Rules of Civil Procedure, "to achieve the just determination in every action."). As a result, motions brought under FRCP 60(b) are addressed to the sound discretion of the district court. *See Thompson v. Housing Authority of the City of Los Angeles,* 782 F.2d 829, 832 (9th Cir.), *cert denied,* 479 U.S. 829, 107 S.Ct. 112, 93 L.Ed.2d 60 (1986); *Martella v. Marine Cooks & Stewards Union,* 448 F.2d 729, 730 (9th Cir. 1971), *cert. denied,* 405 U.S. 974, 92 S.Ct. 1191, 31 L.Ed.2d 248 (1972). Moreover, the Ninth Circuit has repeatedly recognized that because FRCP 60(b) is remedial in nature, it should be applied liberally. *See, e.g., In re Roxford Foods, Inc.,* 12 F.3d 875, 879 (9th Cir.1993); *Gregorian v. Izvestia,* 871 F.2d 1515, 1522 (9th Cir. 1989), *cert. denied* 493 U.S. 891, 110 S.Ct.

---

*California Rural Indian Health Bd. v. Shalala,* ND Cal No. C–96–3526, slip opinion, (Aug 25, 1998) (requiring payment to tribe of the full amount of its CSC funding); *Appeals of Alamo Sch. Bd.,* IBCA No. 3560–3562 (1997) (awarding tribe money damages for CSC payments for FY 1994); *Miccosukee Corp.,* IBCA No. 3463–3466 (1997) (same).

**3.** FRCP 60(b) provides, in pertinent part:

On motion and upon such terms as are just, the court may relieve a party or a party's legal representative from a final judgment, order, or proceeding for the following reasons: (1) mistake, inadvertence, surprise, or excusable neglect; ... or (6) any other reason justifying relief from the operation of the judgment.

237, 107 L.Ed.2d 188 (1989); *Meadows v. Dominican Republic,* 817 F.2d 517, 521 (9th Cir.), *cert. denied,* 484 U.S. 976, 108 S.Ct. 487, 98 L.Ed.2d 485 (1987).

## ANALYSIS

Defendants argue that Section 314 bars plaintiff's claims under the ISDEA for CSC for FY 1996 and FY 1997 by limiting the amount of appropriations available to the Secretary for CSC in those years. In other words, they contend that a lack of available funds under Section 314 *now* relieves them of liability for paying CSC costs due in FY 1996 and FY 1997. This court disagrees.

### I. *Section 314 Does Not Modify the IS-DEA*

■ The ISDEA mandates that CSC "shall be added" to an ISDEA contract award. 25 U.S.C. § 450j–1(a)(2). However, that language is subject to 25 U.S.C. § 450j–1(b) (" § 106(b) proviso") which provides that "[n]otwithstanding any other provision in this subchapter, the provision of funds ... is subject to the availability of appropriations." Defendants claim that pursuant to the § 106(b) proviso, the funds available to pay CSC in FY 1994 through FY 1998 has been reduced by Section 314. That argument rests upon an erroneous interpretation of the relationship between the ISDEA requirements and Congress' funding authority.

The § 106(b) proviso addresses only the Secretary's duty to disburse funds which Congress has made available to the Secretary to disburse. Regardless of agency appropriations, the § 106(b) proviso does not limit defendants' obligation to fully fund self-determination contracts. As explained in *Ramah Navajo Sch. Bd.,* 87 F.3d at 1345, "Congress clearly included the proviso not to excuse the Secretary's obligation to follow the mandates of the statute, but rather to make evident that the Secretary is not required to distribute money if Congress does not allocate that money to him under the Act."

Plaintiff does not seek funds from the Secretary that Congress failed to appropriate to IHS. Rather, in the event that such appropriations are insufficient, plaintiff seeks to enforce defendants' binding obligations through the damages remedy provided in 25 U.S.C. § 450m–1a.

This same issue was recently addressed and decided by the Interior Board of Contract Appeals ("IBCA") in *Appeals of Cherokee Nations of Oklahoma,* IBCA 3877–3879–98 (June 30, 1999) involving claims for unpaid CSC asserted against the same defendants for FY 1994, FY 1995, and FY 1996. As did this court, the IBCA ruled that under both the ISDEA and the relevant contractual documents, the Cherokee Nations were entitled to be paid their full CSC in the years in question. Turning to the identical Section 314 issue raised here, the IBCA rejected the contention that Section 314 somehow extinguishes tribal claims for unpaid CSC. The IBCA explained:

> [Section 314] is merely appropriations Act language as such—that is, it deals simply and solely with funding matters and it is limited to the particular years specifically mentioned. It does not purport in any way to modify the provisions of the [ISDEA].... Here, there is no clear indication, and certainly no proof, that the Congress intended either to modify or repeal the CSC mandate of the [ISDEA] or to relieve IHS of its obligation to fully fund CSC for programs already undertaken and completed during the FY's in question.
>
> In addition, ... since the Board's decision in *Alamo,* held that an earmark in BIA's current appropriations Act itself was insufficient to extinguish Miccosukee's right to compensation for contractual work already performed, then *a fortiori* an earmark in an appropriations Act years later is insufficient to extinguish right to compensation for work performed in FY's 1994, 1995, and 1996, unless the Congress' intention to achieve that result in abundantly clear. Here,

however, it is equally probable that the Congress was simply prohibiting the future use of unspent appropriated funds for the 5 prior years as a budgetary measure. We therefore conclude that Cherokee's right to full payment of its CSC for those years has not been extinguished and that it is entitled to the unpaid funds.

*Id.* at 18, 20–21 (citations omitted).

This court fully concurs with the IBCA's analysis.

## II. Section 314 Does Not Bar Plaintiff's Right to Recovery

This court previously ruled that prior to enactment of Section 314, defendants' refusal to fund CSC due under the ISDEA and the contract and funding agreements violated plaintiff's rights and that plaintiff has a right to recover money damages as compensation. Nevertheless, defendants argue that Section 314 "prospectively" nullifies plaintiff's right to recover money damages which have not yet been paid. This argument is fundamentally flawed.

Section 314 expressly bars specified present and future uses of "the total amounts available for fiscal years 1994 through 1998" to IHS. In each of those years, IHS ended the year with an unexpended balance from its lump sum appropriation. In general, such balances remain available for at least five years to pay "obligations" incurred in those years. 31 U.S.C. § 1552(a). Such obligations may include amounts due under contracts. 31 U.S.C. § 1553(a). Thus, prior to enactment of Section 314, any unobligated balances remaining from FY 1994 through FY 1998 remained available to pay CSC requirements due in those years. However, as of the date of its enactment, Section 314 prohibits IHS from using unexpended appropriation balances from FY 1994 through FY 1998 to pay CSC due in those years beyond the amounts "earmarked in committee reports." [4]

If plaintiff's right to recovery arose after enactment of Section 314, then defendants properly could rely on Section 314 to bar payment to plaintiff from IHS's unexpended appropriation balances. However, that is not the case here. Instead, defendants seek to apply Section 314's limitation to obligations that IHS has already accrued and paid into the Registry of the Court. The relief sought by defendants is nothing more than retroactive application of Section 314.

Section 314 cannot alter plaintiff's existing rights "prospectively" because a "prospective law" is one "applicable *only to cases which shall arise after its enactment.*" BLACK'S LAW DICTIONARY 1222 (6 th ed 1990) (emphasis added). Retroactive laws are "those which take away or impair vested rights acquired under existing laws, create new obligations, impose a new duty, or attach a new disability in respect to the transactions or considerations already past." *Id.* at 1317. Or, as the Supreme Court stated in *Landgraf v. USI Film Products*, 511 U.S. 244, 269–70, 114 S.Ct. 1483, 128 L.Ed.2d 229 (1994), a "new provision" is retroactive if it "attaches new legal consequences to events completed before its enactment."

A law that would alter plaintiff's rights and defendants' duties at the time the IHS refused to fund plaintiff as then required by law—or, in the language of *Landgraf,* would change the legal consequences of that event—does not "operate[ ] prospectively" and only can be deemed as "retroactive." A law that "operates prospectively" simply could not, by definition, alter rights and duties, or "attach[ ] new legal consequences," "in respect to ... transactions or considerations already past." BLACK'S LAW DICTIONARY at 1317.

---

**4.** This phrase apparently refers to annual non-binding committee recommendations that IHS use a certain sum for CSC. A recommendation in a committee report is not an "earmark" as that term is used in the appropriations law. An "earmark" is a cap on funding in the form of a "not to exceed" amount for a stated purpose. *See Lincoln v. Vigil,* 508 U.S. 182, 192–93, 113 S.Ct. 2024, 124 L.Ed.2d 101 (1993).

To avoid problems with retroactively applying Section 314, defendants rely on *dicta* in *Plaut v. Spendthrift Farm, Inc.*, 514 U.S. 211, 115 S.Ct. 1447, 131 L.Ed.2d 328 (1995), arguing that "there is no impediment to Congress changing the law in a manner that will affect pending litigation." The statement is wrong for at least two reasons. As discussed below, (1) Congress is not free to repudiate vested rights; and (2) a new law only may be applied to pending litigation if it is clearly intended to be retroactive, which Section 314 is not.

### A. *Congress May Not Repudiate Vested Rights*

To the extent "changing the law in a manner that will affect pending litigation" would impair such rights, the power of Congress is extremely limited. Any interpretation of Section 314 depriving plaintiff of its rights would run afoul of the basic principle that the government may not unilaterally repudiate its obligations, whether embodied in a contract or a statute.

■ As reaffirmed by the Supreme Court in *United States v. Winstar Corp.*, 518 U.S. 839, 116 S.Ct. 2432, 135 L.Ed.2d 964 (1996), the government is bound by its contractual obligations to the same extent as any private party, except under very limited circumstances not applicable here. *Id.* at 883–85 & n. 25, 894–95, 116 S.Ct. 2432 & nn 38–39. Of course, when a private party fails to fulfill its contractual obligations, it is ordinarily liable for money damages. *Id.* at 885, 116 S.Ct. 2432 ("[D]amages are always the default remedy for breach of contract.").

■ These limitations apply to statutory rights as well. The government may not unilaterally abrogate a statutory right to payment in exchange for service once the claimant has completely performed that service. For example, in *United States v. Larionoff*, 431 U.S. 864, 97 S.Ct. 2150, 53 L.Ed.2d 48 (1977), the Court considered the rights of sailors to a "reenlistment bonus," a right that all parties acknowledged "must be determined by reference to the statutes and regulations governing the [reenlistment bonus], rather than to ordinary contract principles." *Id.* at 869, 97 S.Ct. 2150. The case dealt with a bonus awarded to those "whose particular skills were in short supply," as classified by Naval regulations. Those with the "particular skills" who agreed to reenlist were awarded an amount calculated as a multiple of the regular reenlistment bonus once their reenlistment period began. *Id.* at 866, 97 S.Ct. 2150. The claims at issue involved two groups of soldiers: (1) those whose reenlistment period began after a Naval regulation removed their specialty from the list of qualifying skills but before Congress repealed the bonus; and (2) those whose reenlistment period began after Congress repealed the bonus. The government argued that neither group was entitled to the bonus, but the Court disagreed. With regard to the first group, the Court struck down the Navy's regulations, ruling that they reduced the sailors' right to receive the bonus to "a virtual lottery" rather than "a reasonably certain and specific bonus for extending service in the Armed Forces." *Id.* at 877, 97 S.Ct. 2150. With regard to the second group, the Court noted that any attempt by Congress "to deprive a service member of pay due for services already performed, but still owing" would present "serious constitutional questions." *Id.* at 879, 97 S.Ct. 2150.

Plaintiff's right to full funding of CSC is just as much an obligation of the government as the sailors' right to their bonus in *Larionoff*. Here, the ISDEA required IHS to enter into a contract with plaintiff to provide a specified amount of funding, including CSC funding, in exchange for plaintiff's promise to provide services to IHS beneficiaries. IHS then entered into a contract specifying that plaintiff was entitled to an amount "not ... less than the applicable amount determined pursuant to section 106(a)" of the ISDEA.[5] In addi-

---

5. FY 1996 Self–Determination Agreement, § (b)(4), Plaintiff's Memorandum in Support of Motion for Partial Summary Judgment, Exhibit 2, p. 6.

tion, IHS agreed that the plaintiff is "entitled to receive contract support cost pursuant to § 106(a)(2)." [6] The statute cited in these contractual agreements required the Secretary to pay plaintiff the full amount of its CSC, and the Secretary's failure to do so entitled plaintiff to money damages. Because this occurred at a time when appropriations were fully available, all the conditions triggering the Secretary's duty—and plaintiff's corresponding rights—were fulfilled and payment was due. Thus, plaintiff's right to full funding vested when the Secretary received the appropriations allowing IHS to fulfill its obligation. Contrary to defendants' view, plaintiff's rights did not first become vested upon entry of the final judgment in this case.

■ In *Blackhawk Heating & Plumbing Co. v. United States,* 224 Ct.Cl. 111, 622 F.2d 539 (Ct.Cl.1980), the Court of Claims reached the same conclusion under similar facts. There, the court held that the right to payment under a government contract, although conditional upon the availability of appropriations, nonetheless becomes a vested right at the time a payment fell due because "appropriated funds were available" at that time. *Id.* at 553. The court reached this conclusion despite its determination that the rider at issue, in contrast to Section 314, did apply retroactively to limit the availability of appropriations. *Id.* at 552–53.

Defendants respond that plaintiff had no contractual right, but merely a conditional, open-ended and fully revocable statement of present intent. This is illogical. Under defendants' view, had they refused to pay all tribes *any* CSC at all in FY 1994 (one of the years covered by Section 314), they would not have violated the ISDEA or breached any contract, no vested right

would exist, and no claim could ever be made, because Congress might enact a Section 314–type measure some 5, 10 or 20 years later, limiting the availability of the FY 1994 appropriation and thus saving IHS from its own misdeeds. Taken to its logical conclusion, this argument means that such a refusal would never be a breach of contract or a violation of the ISDEA so long as years later Congress enacts a rider (or could enact a rider) saying that "none of the amounts appropriated to IHS in FY 1994 are available for contract support costs under the ISDEA." It is simply not reasonable to interpret the ISDEA and the plaintiff's agreements as providing the Secretary with the right to withhold payments and limit her liability at any time in the indefinite future.[7]

Plaintiff has fully performed its duties and incurred the associated CSC at issue. Thus, its right to the promised payments are vested. Defendants' position that plaintiff's rights are merely conditional and subject to prospective repudiation is rejected.

### B. *Section 314 is Not Retroactive*

■ Defendants do not expressly contend that Section 314 is retroactive. However, as discussed above, the relief they seek is equivalent to its retroactive application, requiring this court to address that theory.

In *Plaut,* the Supreme Court held that the separation of powers barred Congress's enactment of a law requiring federal courts to reopen final judgments. As noted by Justice Scalia:

It is true, as petitioners contend, that Congress can always revise the judgments of Article III courts in one sense: *When a new law makes clear that it is*

---

6. FY 1996 AFA Amendment Number Two, § E, Plaintiff's Memorandum in Support of Motion for Partial Summary Judgment, Exhibit 8, p. 7.

7. Furthermore, to do so would contradict the provisions of the statute and agreements requiring the IHS to provide all funding "as

expeditiously as practicable," and, if quarterly, "not later than the date that is 10 calendar days after the date on which the Office of Management and Budget apportions the appropriations for the fiscal year." Self–Determination Agreement, § (b)(6)(A) & (B), Plaintiff's Memorandum in Support of Summary Judgment, Exhibit 2, pp. 8–9.

*retroactive,* an appellate court must apply that law in reviewing judgments still on appeal that were rendered before the law was enacted, and must alter the outcome accordingly.

514 U.S. at 226, 115 S.Ct. 1447 (emphasis added).

The same point was made directly by Justice Scalia in his concurring opinion in *Landgraf* considering whether provisions of the Civil Rights Act of 1991 creating a right to compensatory and punitive damages and a jury trial under Title VII applied to cases arising before the provisions were enacted. He concluded that these provisions did not apply retroactively to alter existing statutory remedies because nothing in the provisions or anything else indicated such intent. *Id.* at 293, 114 S.Ct. 1483. Indeed, *Landgraf* clearly articulated a strong presumption *against* implied retroactivity.

Under *Plaut* and *Landgraf,* plaintiff's existing rights arising from the government's past actions may not, under any circumstances, be impaired by new legislation unless the government can show that Congress clearly intended the new law to have such a retroactive result. Defendants have not met their burden of showing that Section 314 was intended to have a retroactive result.

**1. *Section 314 Was Not Intended to Nullify This Court's Rulings***

Defendants argue that Section 314 is aimed at nullifying this court's interpretation of the ISDEA and relevant appropriations law. If true, then Congress intended Section 314 to be retroactively applied.

Defendants do not support this argument by any citation to the legislative history expressing such an intent. In fact, the only oblique reference to this litigation in the OCEA's legislative history appears not in connection with Section 314, but in an entirely different part of the report of the Senate Appropriations Committee that accompanied Senate Bill 2237 (which included Section 314). S REP No 105–277 (1998). There the Committee noted its concern about "growing funding shortfalls

in [CSC]," the government's policy of encouraging contracting, the growing number of tribes attracted to contracting (in part by the availability of CSC), and the fact that the "demand for increased CSC funding is a result of an increase in the number of tribes entering the programs." *Id.* The Committee then observed:

> *Against this backdrop, in several cases the Federal courts have held the United States liable for insufficient CSC funding.* The Committee believes the situation needs to be addressed and directs the General Accounting Office [GAO] to conduct a comprehensive examination of existing contracts and compacts for BIA and IHS programs entered pursuant to the ISDEA, as they may be impacted by available appropriations for associated contract support and other indirect costs. The study should examine existing methodologies for calculating tribal contract support costs; report on the causes for the increase in contract support costs; and provide estimates and scenarios for future contract support cost needs under existing methodologies. The study should also include an analysis of the impact of available appropriations on future contracts and compacts and associated contract support costs, an analysis and review of impacts on the quantity and quality of services provided to Indian people through such contracts and compacts, and an analysis of what impacts, if any, have been felt by the worsening CSC situation.

*Id.* (emphasis added).

The report does not say anything about an intent to "nullify" the "several cases in the federal courts" (which could only be a reference to this case, *to Alamo/Miccosukee,* and to the unreported decision in *California Rural Indian Health Bd. v. Shalala,* No. C–96–3526 (ND Cal)), or even that the Committee disagreed with this court's rulings. If Congress had intended Section 314 as a response to and a nullification of this lawsuit, then this court would expect the Committee at least to reference Sec-

tion 314 in the one place where it mentions this litigation. Its silence only confirms that, in fact, Congress intended nothing of the kind.

Thus, defendants have not met their burden of overcoming the presumption against retroactive legislation set forth in *Landgraf.* Absent retroactivity, Section 314 simply cannot extinguish plaintiff's rights or bar the damages remedy ordered by the Court.

### 2. *Section 314 Should be Interpreted to Avoid Retroactive Application*

■ Moreover, several reasons dictate against interpreting Section 314 to apply retroactively. First, the court should interpret Section 314, if at all possible, to avoid grave constitutional questions. *See Edward J. DeBartolo Corp. v. Florida Gulf Coast Bldg. & Const. Trades Council,* 485 U.S. 568, 575, 108 S.Ct. 1392, 99 L.Ed.2d 645 (1988) ("[W]here an otherwise acceptable construction of a statute would raise serious constitutional problems, the Court will construe the statute to avoid such problems unless such construction is plainly contrary to the intent of Congress."); *Larionoff,* 431 U.S. at 879, 97 S.Ct. 2150. Defendants' interpretation of Section 314, which deprives plaintiff of vested rights, seriously implicates the Fifth Amendment's Takings Clause, contradicts its plain meaning, and is unsupported by anything in the legislative history. In contrast, interpreting Section 314 as limiting the IHS's present and future use of its unobligated balances still gives the provision legal effect and accords with its plain language, while avoiding such constitutional issues.

Second, defendants' argument that Section 314 extinguishes plaintiff's right to CSC would necessarily amend the ISDEA by implication. However, any such repeals by implication must be supported by a clear expression of intent, especially "when the claimed repeal rests solely on an Appropriations Act." *Tennessee Valley Auth. v. Hill,* 437 U.S. 153, 190, 98 S.Ct. 2279, 57 L.Ed.2d 117 (1978). The defendants fail to support their interpretation

with any discussion of this issue, much less the required showing of clear intent.

■ Finally, even if the ISDEA is ambiguous, canons of construction unique to Indian legislation require that courts reject any interpretation seeking to exploit such an ambiguity against the tribes to deprive them of funds required to carry out their health care programs. *South Dakota v. Bourland,* 508 U.S. 679, 687, 113 S.Ct. 2309, 124 L.Ed.2d 606 (1993); *Montana v. Blackfeet Tribe of Indians,* 471 U.S. 759, 767, 105 S.Ct. 2399, 85 L.Ed.2d 753 (1985); *DeCoteau v. District County Court for the Tenth Judicial Dist.,* 420 U.S. 425, 447, 95 S.Ct. 1082, 43 L.Ed.2d 300 (1975). This rule applies as much to the exercise of federal administrative authority as it does to statutes, and no less to the ISDEA's contract support provisions as to any other federal Indian legislation. *See Ramah Navajo Chapter,* 112 F.3d at 1461.

Given the lack of any showing that Congress intended to deprive plaintiff of its vested rights or to "nullify" this court's ruling, and the serious constitutional problems raised by any attempted repudiation of those rights, this court will not interpret Section 314 to operate retroactively.

### III. *Section 314 Does Not Bar the Payment of Money Damages from the Judgment Fund*

■ Even if Section 314 bars the use of IHS funds to pay plaintiff's damages, plaintiff contend that defendants may still be compelled to pay damages through the Judgment Fund created by 31 U.S.C. § 1304. To plug this hole, defendants argue that Section 314 expressly makes the Judgment Fund unavailable to pay money damages in this case.

Defendants' position fails for two reasons. First, the judgment here is for money damages, not for CSC, and Section 314 addresses only CSC. Although defendants suggest that Section 314 was meant to address CSC claims, Section 314 simply

does not say that, and does not speak to the availability of funds for money damages ordered by a court.

Second, the plain terms of Section 314 address only how IHS may allocate its appropriations. Section 314 does not mention, much less address, how payments may be made from the permanent Judgment Fund. Whereas Section 314 only places a limit on the amount of funds "available" to IHS for CSC, the permanent Judgment Fund is not controlled by IHS and is not dependent on appropriations to IHS. Rather, the Judgment Fund "establish[es] a central, government-wide judgment fund from which judicial tribunals administering or ordering judgments, awards, or settlements may order payments without being constrained by concerns of whether adequate funds exist[ ] at the agency level to satisfy the judgment." *Bath Iron Works Corp. v. United States,* 20 F.3d 1567, 1583 (Fed.Cir.1994); *see also Wetsel–Oviatt Lumber Co. v. United States,* 38 Fed.Cl. 563, 571 (1997) (explaining that the government may pay a judgment for money damages from Judgment Fund despite lack of agency appropriations to pay for judgment).

Indeed, Section 314 effectively excludes any implicit limitation on the use of the Judgment Fund to pay money damages. It addresses the payment of CSC "as funded by such acts," referring to the IHS appropriations acts for FY 1994 through FY 1998. This language removes any possibility of reading Section 314 to limit the availability of funds provided for payment of money damages under the Judgment Fund appropriation.

A provision limiting an agency's use of its appropriated funds does not prevent a court from awarding damages payable from the Judgment Fund. For example, in *Bath Iron Works,* the Court of Federal Claims rejected the government's argument that a statute prohibiting an agency from using its funds to resolve certain claims administratively also limited the court's authority to grant relief on those claims payable from the Judgment Fund.

*Bath Iron Works,* 20 F.3d at 1582–83. The court noted that the statute did not purport to amend the Judgment Fund appropriation or alter the claimants' statutory rights. Rather, according to its plain meaning, it dealt exclusively with "the use of funds appropriated to the Department of Defense in administrative settlements." *Id.* Specifically, the court held that the provision only limited the ability of a contracting officer to "adjust" contracts administratively: "By its own terms, that section has no applicability whatsoever to proceedings in the [Court of Federal Claims], the power of its judges or the rights of contractors under the [Contract Disputes Act]." *Id.* at 1580.

Similarly here, Section 314 by its express terms limits only the agency's use of particular funds for payment of CSC. Nothing in the provision's terms or its legislative history reveals that Congress intended to limit the ability of the courts to award money damages under 25 U.S.C. § 450m–1.

Defendants place decisive weight on the opening clause of Section 314 which reads: "Notwithstanding any other provision of law. . . ." They argue that this clause prevents the Judgment Fund from being used to augment the total amount that Congress wants allocated to new CSC claims.

This "notwithstanding" clause must be determined with reference to its context and the rest of the provision. Existing laws are preempted only to the extent the provision's terms require that result. For example, the Ninth Circuit recently held that the "notwithstanding" clause was not "preemptive" and did not impliedly repeal the underlying statute or regulatory provisions if an alternative construction reconciled the provisions. *Northwest Forest Resource Council v. Pilchuck Audubon Society,* 97 F.3d 1161, 1166–67 (9th Cir. 1996). Similarly in *Oregon Natural Resources Council v. Thomas,* 92 F.3d 792, 796–97 (9th Cir.1996), the Ninth Circuit held that a "notwithstanding" provision

only superceded certain laws, not all applicable laws.

The issue is not the meaning of the word "any," but whether the substantive portion of Section 314 actually conflicts with and thus overrides the provisions of the IS-DEA and the Judgment Fund at issue. The "notwithstanding" clause in context simply means that any excess amounts remaining from the five prior appropriation acts are not to be used to pay CSC due under ISDEA contracts funded by those acts. The Secretary is to keep that money for other authorized purposes, and if some other law suggests otherwise, it is preempted.

Defendants also contend that unless Section 314 bars payment of damages from the Judgment Fund, it is completely eviscerated and rendered a nullity. However, even if Section 314 does not bar payment from the Judgment Fund, it still prohibits the IHS from using its unobligated balances to pay CSC due for FY 1994 through FY 1998. Thus, in the future the IHS Director or an IHS contracting officer may not award a tribe CSC for those years from the appropriation balances remaining from those years, and IHS may not carry out its proposed plan to sweep up and use such balances to reduce its liability for unpaid CSC. Section 314 is far from a nullity.

Regardless of how Section 314 is interpreted, defendants posit another reason why the Judgment Fund is unavailable. By statute, the Judgment Fund is available only where payment is "not otherwise provided for." 31 U.S.C. § 1304(a)(1). Defendants contend that the payment of money damages to plaintiff in this case is "otherwise provided for" because Congress has appropriated specific funds to IHS for the payment of CSC. This argument has been rejected by several Comptroller General opinions. For example:

> Under a rule established by the Comptrollers of the Treasury, *agency appropriations are not, as a general proposition, available to pay litigative awards. See, e.g.,* 1 Comp. Gen. 540 (1922); 8 Comp. Dec. 261, 262 (1901); 8 Comp. Dec. 145, 149 (1901). That rule rendered the appropriations that fund most agencies legally unavailable to pay such awards. Thus, in most cases, those where Congress had waived sovereign immunity from suit, the resulting judgments could not be paid unless the Congress specifically appropriated funds for that purpose. 69 Comp. Gen. 40, 42 (1989); 66 Comp. Gen. 157, 159 (1986). Congress solved this problem by establishing a permanent, indefinite appropriation, the Judgment Fund, and thereby eliminated the need for specific appropriations for most of the judgments (and later, compromise settlements) which had previously required specific appropriations.

B–251061.2, 1993 WL 58276, *1 (emphasis added).[8]

Again, in B–197742, 1986 WL 63966, the Comptroller General stated the general rule that "final judgments against the United States" are payable from the permanent judgment appropriation. *Id.* at *2; *accord* 73 Comp Gen 46, 48, 1993 WL 505822 *2 ("Agency appropriations are not available to pay litigative awards, unless provided for by law."). There may be some circumstances when Congress appropriates funds specifically to pay litigative awards and thus "otherwise provide[s]" for them, but Congress has not done that here. Contrary to the defendants' argument, payment of the judgment here is not "otherwise provided for" through IHS's ordinary appropriation.[9]

---

8. The main point of this opinion is that settlements entered into by the Farm Credit Administration could not be paid from the Judgment Fund because that fund is available only for awards and *settlements involving agencies* "whose expenses [are] paid from appropriated funds." *Id.* at *2. Here, the IHS is such an agency.

9. If IHS inappropriately tapped into its lapsed appropriations to pay this court's judgment, then presumably it may seek reimbursement from the Judgment Fund.

Defendants next claim that the payment of money damages from the Judgment Fund would violate the Appropriations Clause, Article I, § 9, clause 7 of the United States Constitution. This, too, is meritless. "Funds may be paid out [from the Judgment Fund] only on the basis of a judgment based on a substantive right to compensation based on the express terms of a specific statute." *Office of Personnel Management v. Richmond,* 496 U.S. 414, 432, 110 S.Ct. 2465, 110 L.Ed.2d 387 (1990). Here, plaintiff meet each of these conditions. They seek a payment of money damages on the basis of this court's judgment which, in turn, is based on their substantive rights to compensation under the express terms of the ISDEA.

Finally, defendants argue that its payment of the judgment into the Registry of the Court "is no different than if the funds had been segregated by IHS and held by the agency in one of its appropriations accounts." But there *is* a key difference: The funds paid into the Registry of the Court may be disbursed to plaintiff with *no further agency action.* IHS has no control over those funds, and they will be returned to IHS only if it ultimately prevails on appeal or if plaintiff settles for a lesser amount. On the other hand, funds held in an agency account are under the agency's control, and disbursement of those funds to plaintiff upon final judgment would require additional agency action that is now barred by Section 314 (assuming that IHS is not forbidden from using appropriated funds to pay litigative awards). Section 314 limits only IHS's use of its funds, not disbursement of funds already paid by IHS into the Registry of the Court over which IHS has relinquished complete control.

### CONCLUSION

In summary, defendants' motion is denied for the following reasons:

1. Section 314, by its plain terms, prohibits IHS from *now* using any unexpended appropriation balances remaining from FY 1994 through FY 1998 to pay CSC beyond the amounts recommended by Congress.

2. Section 314 cannot extinguish plaintiff's rights to CSC after they have fully vested, reveals no intent to be applied retroactively, and should not be interpreted to apply retroactively.

3. Section 314 does not bar payment of money damages to plaintiff from the Judgment Fund.

### ORDER

For the reasons set forth in the accompanying Opinion, defendants' Motion for Indicative Ruling and for Reconsideration (docket # 131) is construed as including an underlying motion under FRCP 60(b) and the underlying motion under FRCP 60(b) is hereby DENIED.